3-09-1056 Empress Casino Joliet Corporation et al, appellant Michelle Oterizzi v. Alexi Giannoulias and Val Moral, Gracie Glove, et al, Abilie Richard-Hazard, and William McKenna. Please proceed. Thank you, Your Honor. Good morning. May it please the Court, Michelle Oterizzi on behalf of the four plaintiff casinos. In the first Empress case, the Supreme Court rejected our uniformity clause challenge, holding that the General Assembly could constitutionally impose a 3% surcharge on only the four plaintiff casinos to subsidize the racetracks, while exempting the other five casinos that do business in the state. And the key question, we all agree, is how to properly interpret the Supreme Court's reasoning in that decision. Because the classification in the 2006 act, which the court upheld, is the same as the classification in the 2008 act. It is based on casinos that had 200 million or more of adjusted gross receipts. That means what they took in as wagers minus what they paid out in winnings in 2004. And the Supreme Court said that the statute does not explain why there's this classification. It was clearly a compromise because when they tried to pass the legislation the first time and charge all nine casinos, it didn't pass, and then this compromise was put in. And the Supreme Court said it doesn't matter why the compromise was actually done. Instead, the question is, is there any reasonable basis for this classification? And it's the defendant's burden to come forward with a reason for the classification. And here, in the 2006 act case, the state and the intervener said the reason is that the four casinos who were above 200 million could, in 2004, could absorb the charge, and the legislature could reasonably believe that the ones who were below it could not. And the Supreme Court, and we don't dispute that as a proper rationale now, because that's what the Supreme Court said. And the Supreme Court said, and 200 million was a reasonable measuring stick for the legislature to use and to decide. Above it, you could afford it, and below it, you could not. And again, we don't dispute the 200 million selection. The final issue that the Supreme Court decided is that it was logical for the General Assembly to apply that measuring stick based on 2004 retrospectively rather than to do it prospectively. And I will admit to your honors that we argued that that was not reasonable in the 2006 act. And we said, well, what happens? Suppose things change. And the Supreme Court said it was reasonable. At that time, there was no basis to think it would change. And the act was only for two years. It had a sunset provision. So when we get to the 2008 act, the question is only on that third prong that the Supreme Court decided in 2006. It was logical in 2006 to apply 2004 criteria. Is it still logical in 2008 to do that? And our complaint alleges that it was not. And the reason why it was not is because circumstances had changed dramatically. For the casino industry by November 2008 when this new act was passed. And the new act imposes a surcharge for a period of three years absent certain events happening. It's continuing to be paid now. And it's likely to go for the entire three years through 2011. And the events that had changed were, first of all, in January 2008, the state imposed a smoking ban that was enforceable in all casinos. And that hurt casino business, because other casinos in neighboring states do allow smokers to smoke while they gamble, and that hurt business. Then in 2008, the economy started to go down. In September, we had the financial crisis, and the economy fell off a cliff. And that had a profound impact, together with the smoking ban, on the adjusted gross receipts of all casinos in the state. In fact, the casinos were down 21%. So by November, when the General Assembly passes this act, reenacting the 3% surcharge, it knows that at least one of the casinos is not going to hit 200 million for 2008. Acts in a miracle, it's not going to make that. And it knows that because the Illinois Gaming Board issues monthly reports available on its website showing how much AGR each casino in the state is getting on a monthly and then an annual basis. And it does that because the state gets a lot of revenue, not just from the surcharge, but also from wagering taxes based on AGR. So it keeps very close track of it. So we're in a very different situation than the General Assembly had been in in 2006, when it appeared likely that the AGR from 2004 was going to continue the same way. Here, we have one of these casinos, Empress, is in a situation where it didn't make it in 2008, it didn't make it in 2009, and it didn't make it in 2010. And nevertheless, it has to pay millions of dollars in surcharges. Even though, if you take the Supreme Court's decision at face value, 200 million is the point at below which you're really not able to pay the surcharge. And that's why we say this is a different case. Collateral estoppel should not have been applied, because it's different facts and circumstances than were before the Supreme Court. Now, excuse me. The state argues that, well, maybe they really weren't talking about 200 million. Maybe they were really just talking about the four highest grossing casinos in the state. But the problem with that analysis is you're saying that you can base the classification not on some objective measure of ability to pay, which a $200 million AGR limit gives you, but rather on who the four highest in the state happen to be. And I submit to you that that is not a reasonable classification. In fact, it's inherently arbitrary. Why pick four? Why not pick two? They would be better able to pay than the next two in line. Or why not pick six? It gives you no basis for coming up- You want us to consider factors after the act was passed, right? I mean, aren't you putting forward factors that happened after? We did allege things that happened after, but we also allege that there had already been dramatic differences. That were known by the General Assembly at the time the act was passed. Didn't the Supreme Court say facts afterwards or, I mean, sort of indicate that facts afterwards would be impractical or inconceivable or logically impossible to apply facts that are after the legislation? What the court said is that because this is done on a daily basis, it's assessed on a daily basis, that it would be impractical to figure out on a daily basis where you were and who's able to pay or not. And that was in the context of the hypotheticals we'd given the court. And it said it was logical to do it retrospectively. Based on the situation that was in existence at the time the 2006 act was passed. I submit to your honor that based on where the 2008 act was passed, that the failure to take into account that the change in circumstances shows us that what the General Assembly could not have been doing this based on a rational distinction between those who are able to pay and those who are not. But rather is simply targeting these four casinos. But you're considering circumstances that you're advocating the use of circumstances that post-date the passage of the statute. I think you can use that to illuminate what happened, but I think, and I think, your honor, that if there had been nothing that had happened before the 2008 act was passed. And it had all happened afterwards, that we would be having a much more difficult time. But the fact is that there were these dramatic changes in the business environment, in the casino environment, before the act was passed. And the fact that the legislature could look at those monthly AGR figures and see at least one of these casinos isn't going to make this, even for 2008, isn't going to make 200 million. And yet, we go back and we say, you have to pay the surcharge anyway, because we're going to use 2004 AGR. Okay, what if they had rewritten the statute and said 150 million? Well, then if it had been 150 million, then they might have caught some of the other casinos coming up. And then it would be different. Well, don't you think those other casinos are also having the same business, that the casinos may be less and probably having the same business downturn? They might. That your casinos are. They might. They might have the same thing. But I think the point is, your honor, that when you're looking at the classifications here, you can't say they could have done it another way that would have resulted in the four casinos paying and the five being exempt. The question is whether the classification that was selected, which is 200 million in AGR in 2004, is a reasonable classification. The AGR between 2004 and 2007 is about the same, isn't it? It is. Right. The situation hadn't changed. You know, 2007, the casinos were on an upward trajectory between 2005, 2006, 2007. And it wasn't until 2008 when you hit these two enormous speed bumps of having the smoking ban put in as of January 1, and then the economic situation, that things changed. There was some consideration of the changing factors, though when the second legislation was passed, wasn't there? Right. They knew about them. They changed them. Right. And the question here is not actually what they did. It's whether it is logical to use 2004 as the measuring point at a time when you know about this situation. And whether the way you've done this classification system shows that you were interested in making a classification based on ability to pay. That these folks are able to pay, and these folks are not. I mean, we're dealing with a uniformity clause. Yes. Okay. And so we're looking at it from that perspective. We're not looking at it as, was this the wisest thing to do, or is there some better standard that we could apply? Right. I mean, every person in the room could come up with a different standard and say, maybe this, perhaps this is better. Right. Except the uniformity clause, this statute is very unusual if you look along it at fees and taxes under Illinois law. I don't think there's another one you can find that's been litigated anyway, where you have similarly situated businesses, we would say identical businesses, making different payments on identical income. Because here, if you've got $25 million of AGR, both pay a wagering tax of 15% on that. But our clients pay an extra 3%. They pay 18% to the state. Well, that was one of the arguments. That's already been resolved, hasn't it? It has. I mean, that was the argument in the earlier case. Right. And the Supreme Court rejected it. Right. But the Supreme Court said, yes, you can do that if you have a reasonable basis for doing the classification. And you're classifying between those who are able to pay and those who are not. And that the legislature, you know, the legislature doesn't have to draw perfect lines. It could decide that that reasonable basis is $200 million. It could have decided $100 million. It didn't. It could have decided the $200 million. And we have to accept that. And all we're saying is, yes, but your theory is that if you make $200 million in AGR in a year, you can afford to pay it. If you can't, if you don't make $200 million, then you can't afford to pay it. But here, you've got a situation where you knew one of these casinos wasn't going to make $200 million. And yet, you imposed it by going back to 2004. And that's not rational. And what it shows you is that the basis for this classification could not have been ability to pay. Instead, they're targeting the four casinos. It's like you do, the legislature sometimes does when they want to hit only Cook County or give only Cook County a benefit. They say any county having more than 500,000 people. Well, here, it's these four casinos we want you to pay. And nobody has come up with a rationale other than ability to pay to justify that classification. And that's why we say that under these changed circumstances, you can't, you have a uniformity clause violation, even though the last time, when the circumstances were different, you did not. Counsel, that's two minutes. The court said that the old form of information was good enough for 06, didn't it? It did. It did. But there, again, we had not alleged, nor could we have alleged, that there was any change in circumstances between 04 and 06. It was exactly the same. It was exactly the same in 07. All the casinos were doing well. They were all over $200 million. And there was no reason to believe when the 2006 Act was put into place that there would be any difference in this relatively short period of time. Whereas, by 2008, everything has changed. The world has changed in many ways for the casinos and for everyone. And there's every reason to believe that at least some of those casinos might never hit that $200 million mark during the whole three years. And that's, in fact, what's happened to Empress. Well, when does that last? It's three years from when it was signed in. So December 2008. So this year. It could also be eliminated if the tracks got, were allowed slot machines, or if the 10th license comes up. But none of that is likely to happen by the end of the year. Thank you. Thank you, Pat. Thank you. May it please the Court. I'm Assistant Attorney General Richard Huzik, Counsel for the Comptroller and for the Racing Board. And I urge the Court to affirm the dismissal of this suit because the plaintiffs' allegations are insufficient to sustain their burden. Not the defendant's burden of proving the law is reasonable, but their burden of proving that the law is unreasonable. The key consideration here is that the plaintiffs are not giving sufficient deference to the legislative determination. The Court has repeatedly held that the Uniformity Clause is not some straitjacket. It does not impose strict scrutiny, some narrowly tailored statute, carefully crafted to meet only a well-focused set of objects. Perfect rationality is not required. And in the Empress One decision, the Supreme Court held that the ability to absorb as a valid rationale for distinguishing between some of the casinos subject to the surcharges and those that are not, that using a single measuring point of 2004 was valid for the duration of that two-year statute, and that the adjusted gross revenues of over $200 million in 2004 was a reasonable connection or criterion to use in furtherance of that rationale of dividing between casinos who are better able to afford or absorb and those who are less able to absorb or afford. There is very little difference between this statute and the statute upheld in Empress One. It's three years instead of two years, but the criterion is essentially the same. And the plaintiffs are here arguing that that criterion is no longer good because the legislature should have created something that had a reset provision or an opt-out so that if there were any of the casinos whose adjusted gross revenues in that current year or immediately preceding year went below $200 million, then necessarily they should have had the ability to opt out or to be excluded. And because of the lack of that exclusion, the whole statute is void in its entirety and cannot be applied to anybody. And even the casinos that are making the most money would be exempt from it. Well, they converted the Empress One case into a straitjacket now. They are misreading it as saying that anything below $200 million is not reasonable. The Supreme Court didn't suggest, much less fold, that that was the case. And to the extent that the plaintiffs' and the appellants' argument is saying that we have a disagreement about the interpretation of Empress One, I would agree. They are misreading that case as holding that $200 million in annual gross revenues is the be-all and end-all of affordability. They didn't say that. They said that is a reasonable basis on which the legislature could have advanced that goal of defining or discriminating between those who are better able to afford and those who are not. So they have tried to convert that case into a straitjacket. To the extent that the Empress Casino case doesn't fully resolve this case, yes, it's a different statute. Some of the circumstances have changed. It nonetheless goes a long way to resolve this case because it approves the ability to absorb rationale. It says that a single measuring point, certainly for two years, is valid. Here we have three. And it held that the $200 million number was a reasonable, they used the word measuring stick, I would just say cutoff point for that determination by the legislature. It was not incumbent upon the legislature in that case to anticipate every potential future change in events that might make that criterion appear to be no longer even a reasonable fit. And here we have a three-year sunset provision subject to these stop triggers so that if the 10th casino goes online or additional taxes are imposed on any of the casinos, even these surcharges cease to apply. The notion that there is some talismanic significance to the $200 million threshold, I think, cannot be supported. And even in the plaintiff's reply brief, they said that the legislature could have used a larger or a lower number. They say they could have set it higher or lower within reasonable bounds. That's at page 9 of their reply brief. But if they can do that, then why can't they look at the recent relevant data and say that for the full year 2007, as the chart at the back of the appendix in the State Defendant's reply brief shows, that through 2007, the same four casinos that the Supreme Court referred to as the upstate casinos continued to have considerably higher revenues than all the others. They'd all been tracking essentially in the same rank for nine years. There was no change. Was it reasonable for the legislature at that point to make the assumption that for the next three years, that that situation would continue to be the case? And I think that for the plaintiffs to argue that the new facts that the legislature was aware of invalidate the statute, it puts the argument on its head. It renders a disservice to the General Assembly because they were aware of those facts. They were aware of the effect of the smoking ban and the economy on the casino's revenues. They'd all gone down across the board. The record will establish that. That's in the materials submitted in their appendix to their brief and ours. But they said, nonetheless, the horse racing industry is still struggling. These same four casinos are the ones that are still in the best position to be able to afford this. We're going to tack three more years on to the statute. That was a reasonable determination for the legislature to make at that point in time. Let me just interject a little bit. Anything in the first Empress decision of the Supreme Court that would lead you to believe that had the sunset provision on the first law been five years instead of two, that the result would have been any different? It's hard to know. I mean, we're sort of guessing in a counterfactual situation, hypothetically. I would say that if this statute were put in place and said, no matter what happens to the revenues of any of these casinos for the next 100 years, these four are always going to have to pay the surcharges and nobody else would, I think that there would be an argument about a facial challenge to the statute. But it's important to note here that really what's going on with these subsequent events, the fire at the Empress Casino, that type of thing, those are peculiarly the subject of an as-applied challenge, not a facial challenge. And although in their reply brief, the appellants pay sort of lip service to the idea that they have asserted an applied as-applied challenge, I don't see it anywhere. I don't see it in the pleadings below. I don't see it in their opening brief. And I don't even see it being elaborated in their reply brief. And I think under the rules of appellate practice, that is too little too late. This is a facial challenge. It all rises or falls on the argument that the $200 million figure was a talismanic amount below which no constitutionally reasonable determination of the ability to absorb could be sustained by the courts. And that subsequent, you know, the legislature's inability to predict with perfect certainty for the next three years exactly how the revenues would play out renders the whole enterprise unreasonable. And I think that's essentially counterintuitive. The legislature- That was two minutes. A hundred years would be a magic number to you, though. A hundred years, I think, would be a magic number. We would concede that if they were to say that there was no possible revision and that that would apply for a hundred years, I think we're in a fair place to concede that that would not be a reasonable benchmark or sunset. I apologize for this, but if, as a technical matter, the arguments appear to me to suggest this is purely a- we're looking at a 615 decision. We are, Your Honor. Okay. Although there's reference to 615 in the judge's thing, but is it really that clear if it was 619 or 615, the decision? Do you think it's clear that it was a 615 decision? That's my understanding of the basis on which the state defendants moved to dismiss, and that motion was granted. I mean, there was a 615 motion, 619. But I don't believe- I mean, sometimes 619 is a hybrid where it both does partial duty as a mini motion for summary judgment where you have affirmative matter that defeats. And sometimes it's essentially, you know, just look at the face of the pleading, treat the allegations as true, but it's still legally insufficient in light of some affirmative matter. Here, I think it does boil down to- Would that be a judgment on the pleading system? It could be as well, which is 615E provision, yes. Here, I think it does boil down to the sufficiency of these allegations in their pleading. Are they enough to sustain their burden of proving that the legislative determination is unreasonable or arbitrary? And we use arbitrary not in the sense that, you know, you have an arbitrary cutoff, you can't vote until you're 18, 0.8% alcohol, you know, you're legally unable to drive. I mean arbitrary in the sense that, you know, bizarre and irrational. That's the standard. And here, if the legislature could reasonably have concluded that those casinos who in 2004 had adjusted gross revenues over $200 million, and they had some facts in front of them to show what the subsequent experience had been, that those same casinos were in the best position to be able to absorb the surcharges for the next three-year period. If that determination was reasonable, then the statute is facially constitutional. That's essentially, based upon these allegations, what the circuit court ruled. I just have one more question, and that is with regard to the collateral estoppel. You've sort of really moved away from that, haven't you? We did argue that in the lower court. I was responsible for writing the brief in this court. I discussed that issue with the circuit court counsel. We concurred in the decision to press the issue that we think is the best one for affirming on appeal, and that is simply the reasonableness test in light of the Empress One decision and the additional allegations made here. Thank you, Your Honor. Thank you. Thank you. Good morning. Can you please declare William McKenna on behalf of the intervening racetracks? I'm going to talk for just a few moments about uniformity, and then I will talk a bit, a very small amount, about collateral estoppel as well. The court heard this morning Ms. Orizzi very eloquently, because she's always very eloquent, arguing that what the General Assembly did when it reenacted this statute was not rational. Well, I suggested to the court, put yourself in their shoes for just a minute. And here's the timeline. Supreme Court decided Empress One in June. Who's shoes are we putting on? The General Assembly. A lot of shoes there. But so the General Assembly is considering this reenactment. Supreme Court decides the Emerald case in June of 2008. This then comes before the General Assembly in November of 2008, and you've seen some of the excerpts from the legislative debate in the briefs. They pass it in November with a finding that says we're going to reenact the provisions approved in 2006 and determine valid in 2008. So, and that happened in November of 2008. So at the time they voted to reenact and extend this statute and maintain this 2004 AGR standard for the classification, they had a classification that had been affirmed by the Supreme Court four months earlier. And not only that, not only did they have a classification that had just been affirmed four months before, but they had a full nine years of four-year records of technically available to them from 1999 all the way through 2007 that showed exactly the same thing. In Minnesota we see acknowledged that today, that the four upstate votes had over 200 million in AGR every single year, including 2007. So Missouri says, but, but in 2008, everything fell apart. We had a smoking ban. We had the economy turn. Other things happened later. Well, unfortunately, you don't do legislative fact-finding on the determinations and the classifications of the General Assembly. They can't come in here and say, we can draw that line much better, which is really what they're doing. Think about this hypothetical question. What if the reenacted bill had said, we're going to tax those casinos with over 200 million in adjusted gross revenue in 2007? You're literally the year before. It is 200 million. You still have these events that are being argued about by the votes in 2008. And what that really demonstrates is, I don't think there's any question the statute's valid, just like I don't think there's any question that the General Assembly acted rationally when they had a four-month-old Supreme Court decision and said, we'll reenact the same thing. What they're really inviting you to do with all their arguments is draw lines and do judicial fact-finding. So now I'll shift and just a word about collateral estoppel. That was the Court's rationale, and we do urge it as a basis for affirmance. In particular, there are two findings. And I don't think there's any dispute about the elements here, with the exception of the element of, was it the identical issue? And there are two findings in Amparis that are just dead on in the decision. And the first one is, when the Supreme Court says, plaintiffs have not shown that there is no real and substantial difference between downstate casinos and upstate casinos, which were the ones that have AGRs over 200 million. That's one finding they made. And the other finding they made, at the very end of the uniformity section of their decision, they said, we conclude, plaintiffs have failed to meet their burden of demonstrating that there is no real and substantial difference between the two groups of casinos. Those are the findings that were put before the Circuit Court. And the Court said, yeah, it's the same parties. It's final. And it went all the way to the U.S. Supreme Court, where cert was denied. And it was actually a necessary decision made in the process of the case. Now, what's suggested by the votes here is, oh, things have changed. There's an exception in the world of collateral estoppel for changed circumstances. True enough, as a matter of black-letter law. But in the world of constitutional litigation, the changes that they're suggesting occurred really are not material. So I think the Court can affirm the judgment below, on either the collateral estoppel ground or just on the uniformity. Thank you. Thank you, Counsel. Counsel? It is true that the General Assembly, in 2008, had just seen the Empress decision. But that didn't give it a free pass to make a determination and to make a classification that didn't meet the uniformity clause. They may certainly have thought, oh, well, the Court upheld it, and therefore we don't have to change it. That may be the thought process. What would have been different had they used the 2006 numbers? 2006 or 2007, nothing. It would not have been different. But again, the Supreme Court said it was OK to use the retrospective numbers in 2006. But there were no changes. Here, you couldn't use retrospective numbers because circumstances had changed. And you knew that indications of past performance were no indicator of that future. But the circumstances changed later. They always tell you with investments. The circumstances changed after the passage. The circumstances here changed before the passage. And after. And after. Yes, they continued going downhill. But enough of the circumstances had changed. And it was already visible in the monthly agency. Well, so there were no signs there. There were sufficient signs so that you understood that you couldn't predict the future based on what had happened. Wouldn't there have been a problem as well if the economy, if the smoking issue was not involved, and the economy kept booming, and one of the downstream casinos reached the $200 million level? Yes. Yes, there would have been a problem in that kind of situation. As you get further away from that 2004, if we had gone the other way, that's exactly right, Your Honor, that it would no longer be an appropriate classification. And counsel said we're giving talismanic significance to that $200 million. Well, it's not us who are doing that. It's the General Assembly. It picked $200 million as the level on which you cut it. Otherwise, what you're left with is saying that it's kind of a gestalt feeling that we think really, you know, based on the past nine years, and based on this, you know, their win percentage, and based on this and that, you four should pay, and you five, you don't have to pay. But that is not an objective measure. And that's what the Uniformity Clause was designed to prevent, is from somebody singling out these people who maybe didn't have the political clout to be able to protect themselves in the legislature. That's what Justice Jackson says. That's why you have that. So we have to have objective classifications. And they picked one, $200 million. The problem was in 2008 that they didn't apply it in a rational fashion. And that means that what they were doing was not making a determination based on the reasonableness of the classification. Based on ability to pay. And so that explanation goes out the window, and there's nothing left. And that's the basis for our facial challenge. And I believe we did make an as-applied challenge for Amherst as well. When did you make that? It was argued in the circuit court. It maybe was argued in a little bit of a backwards way, but the argument was made, gee, if this is your argument, then only Amherst has a claim. And we said, Amherst has a claim, and so did the rest. And we reiterated that in our opening briefing appeal. So I think that's sufficient to preserve both. I have to say that I find it interesting with taxation, to use the word gestalt. Well, but I think that's... I'm not saying it's inappropriate. Right, right. We wouldn't want to have a situation where they could say, well, the top 50% of the new tax increase, the top 50% have to pay an income tax increase. And the other 50%, we don't think you're able to pay, so you do that. No, you would put it at a basis, assuming we could have graduated income taxes, which we can't in Illinois. But you would say, if you made it to $25,000, you have to pay the surcharge. And if you made below it, you would not. And what they're really arguing for is you get to select who gets to pay based on sort of objective facts rather than on objective facts. And if we go that far, the uniformity clause, I think, becomes meaningless. So we'd have support to reverse. I was just thinking that we should go down to Carbondale and make the argument that the people in Chicago don't have any political clout. Thank you, Your Honor. Okay, thank you very much, counsel. The court will take this case under advisement and rather a decision with dispatch, and we'll now take a...